O

<mark>CLOSED</mark>

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHAEL MARLO,                    )  Case No. CV 03-04336 DDP (RZx)
                                  )
                Plaintiff,        )  **ORDER AWARDING ATTORNEYS' FEES**
                                  )  **AND COSTS**
        v.                        )
                                  )  [Motion filed on July 18, 2009]
UNITED PARCEL SERVICE, INC.,      )
a corporation,                    )
                                  )
                Defendant.        )
_____   )

    This matter comes before the Court on Plaintiff Michael
Marlo's Motion for Attorneys' Fees and Costs in this California
wage and hour case.  After an eight-day trial, the jury awarded
Marlo $162,992.85 in uncompensated overtime and missed meal and
rest period premiums, and the Court subsequently awarded an
additional $71,151.00 in restitution and $15,290.00 in prejudgment
interest on the missed meal and rest period premiums, for a total
pre-attorneys' fees judgment of $249,433.85.  Marlo now seeks an
attorneys' fee award of over $5 million and an award of $53,857.37
in costs[1] for the six years of litigation in this case.  UPS
opposes the motion.  After reviewing the materials submitted by the

_____

    [1]The application for costs is before the Clerk.  <u>See</u> C.D. Cal.
L.R. 54-3.

parties, hearing oral argument, and considering all of the

arguments presented, the Court awards attorneys' fees in the amount

of $1,176,710.50.

**I.    BACKGROUND**

The six-year history of this case is well-known to the parties

and to the Court.  Because Plaintiff's Motion centers on that

history and time expended by his attorneys throughout it, the Court

reviews the history briefly before discussing the merits of

Plaintiff's motion.[2]

**A.    Claims**

Plaintiff Michael Marlo brings this suit against his former

employer, UPS, for whom he worked as a full-time supervisor during

the relevant time period of this suit, May 6, 1999 through November

12, 2008.  The Complaint alleges five causes of action: (1)

violation of California Labor Code § 1198; (2) failure to pay

overtime compensation; (3) violation of California Business and

Professions Code § 17200; (4) failure to provide required meal

periods and rest breaks; and (5) declaratory relief.

Marlo claims that he worked as a Hub Supervisor, a Preload

Supervisor, or an On-Road Supervisor during the entirety of the

relevant period.  It was undisputed that UPS classified Marlo as an

employee who was exempt from the overtime requirements of the

California Labor Code, and did not pay him overtime for hours

worked in excess of eight per day or forty per week.  Marlo claims

---

[2]Though the Court is intimately familiar with the details of
the litigation, which involved complex legal and procedural
questions, the Court notes that a glance at the docket for this
case goes part of the way toward telling the story of its scope.
In particular, the docket entries reflect the volume of filings and
evidence that have accompanied each thoroughly briefed motion.

that he was mis-classified and seeks payment for overtime and for missed meal and rest periods pursuant to the California Labor Code and the relevant Industrial Wage Commission Wage Order, IWC Wage Order No. 9-2001, Title 8, section 11090 of the California Code of Regulations.  UPS argues that Marlo is not entitled to overtime or for compensation for missed meal and rest periods because he qualifies as an exempt employee under the Wage Order's Executive Exemption and Administrative Exemption.  Cal. Code Regs. tit. 8, § 11090(1)(A)(1)-(2).

**B.   Pre-Certification History**

On March 20, 2003, Marlo filed an "Initial Report or Claim" with the State of California's Department of Industrial Relations, Division of Labor Standards Enforcement ("DLSE").  Peters Reply Decl., Ex. A.  In a letter dated April 17, 2003, DLSE informed Marlo that Marlo filed his Complaint in Los Angeles County Superior Court on May 6, 2003 as a purported class action on behalf of all hub, preload, and on-road full time supervisors.  Defendant removed the case to this court on June 18, 2003 on the basis of diversity jurisdiction.

The parties engaged in pre-certification discovery from June 2003 through June 2004.  This discovery included Federal Rule of Civil Procedure 26 disclosures, written discovery and document production, Plaintiff's deposition, and the depositions of UPS personnel.

**C.   Proceedings While Certified As a Class Action (Spring 2004 through May 2008)**

The case proceeded as a class action from June 10, 2004 until May 19, 2008.

1          1.   Class Certification

2          From April 2004 through June 2004, the parties briefed

3     Plaintiff's Motion for Class Certification, which UPS opposed.[3]   In

4     an Order dated June 10, 2004, the Court granted Plaintiff's Motion,

5     and certified a class consisting of "Full-Time Pre-Load

6     Supervisors, Full-Time Package Center Supervisors, and Full-Time

7     Hub Operations Supervisors employed by UPS from 2000 to the

8     present."   Order Granting Defendant's [sic] Motion for Class

9     Certification 14 (Doc. No. 67) (June 10, 2004).   Plaintiff drafted

10    and filed a motion for summary judgment on June 24, 2004.   The

11    following day, UPS filed an *ex parte* application to continue the

12    hearing on the Motion for Summary Judgment, to reopen discovery,

13    and to continue dates or in the alternative, to stay the action

14    while UPS sought appellate review of the Court's certification

15    order.   The Court granted in part the application to reopen

16    discovery and continue relevant dates.   On July 16, 2004, the Ninth

17    Circuit denied Defendant's petition for permission to appeal the

18    Court's certification order.

19          2.   Post-Certification Discovery and Law and Motion

20         The parties then engaged in post-certification discovery,

21    which included the depositions of numerous additional class members

22    throughout the State of California and tens of thousands of

23    documents and electronic data.   On January 3, 2005, Plaintiff filed

24    a revised Motion for Summary Judgment.

25         On January 10, 2005, UPS moved to Amend the Case Management

26    Order to reopen discovery following the production of class

27    _____

28         [3]In support of its Opposition, UPS submitted numerous
      declarations and evidence.

                                   4

information forms.  The Court ultimately granted UPS's motion
regarding discovery and allowed UPS to take the depositions of an
additional 20 class members.  UPS also filed two additional Motions
for Partial Summary Judgment, one of which addressed the Motor
Carrier Act defense.  Because the Motor Carrier Act ("MCA") defense
was late-raised, the Court granted Plaintiff's request to vacate
Defendant's Motions for Summary Judgment and permit additional
discovery on the MCA issue.

     Following that additional discovery, Plaintiff and Defendants
again filed Motions for Summary Judgment, which addressed the
previously-raised executive and administrative exemptions and the
newly-raised MCA defense on March 16, 2005.

     From April 2005 through June 2005, the parties litigated the
issue of whether sanctions should be awarded against UPS for
failing to follow a prior Court order to produce the person most
knowledgeable about a computer crash that resulted in the loss of
relevant data.  After briefing, witnesses, and documentary
evidence, the parties reached a settlement on the sanctions dispute
that included an order directing UPS to produce previously withheld
documents and data.[4]  After further discovery and a Motion for
Clarification of the Court's June 10, 2004 Order (regarding class
membership), the Court heard the Motions for Summary Judgment on
August 17, 2005.  On August 22, 2005, the Court denied Plaintiff's
motions and granted summary judgment in favor of UPS on the
executive exemption.  See Doc. No. 584 (August 22, 2005).

          3.   Appeal of Summary Judgment Order

_____

     [4]Plaintiff has already been compensated for the attorneys'
fees for this time period.

1        Following the Court's August 22, 2005 Order, Plaintiff
2   appealed the case to the Ninth Circuit.  Plaintiff's attorneys
3   retained the services of an appellate attorney, Scott Emblidge, and
4   his law firm to assist with the appeal.  Emblidge Decl. ¶ 5.  The
5   Ninth Circuit issued an order reversing the Court's August 22, 2005
6   Order and remanding the case to this Court.

7                    4.   Decertification

8        This case was reopened on November 21, 2007.  At a status
9   conference held on January 25, 2008, the Court denied UPS's request
10  to file additional Motions for Summary Judgment, but granted its
11  request to brief the issue of decertification.  The parties
12  thereafter briefed and discussed issues regarding trial management.
13  In an Order dated April 3, 2008, the Court ordered briefing on the
14  issue of possible decertification of the class.  In addition to
15  briefing the issues of decertification, the parties noticed Motions
16  in Limine, in light of the trial schedule in this case.  In
17  addition to then-class counsel John Furutani and Mark Peters, the
18  class continued to use the services of attorneys from Moscone,
19  Emblidge & Quadra LLP during this portion of the action.

20       On May 19, 2008, the Court issued an Order decertifying the
21  class because the individualized inquiry that was required by the
22  UPS employment structure and the particular legal theories at issue
23  made class treatment problematic as a legal and practical matter.
24  The Court thereafter certified the issue for interlocutory appeal,
25  and stayed the case pending a decision by the Ninth Circuit as to
26
27
28

1  that appeal.  On August 18, 2008, the Ninth Circuit declined to

2  hear the interlocutory appeal.[5]

3       **D.  Post-Decertification Law and Motion**

4       On December 11, 2008, the Court issued an order granting in

5  part and denying in part a motion by UPS as to various case

6  management issues surrounding the reopening of the case as an

7  individual action.  See Doc. No. 702 (December 11, 2008).  In that

8  Order, the Court returned the case to its active caseload and

9  lifted the stay, explained that the tolling of the statute of

10 limitations for former class members' claims ended on August 18,

11 2008, addressed a prohibition on contact with former class members,

12 and made various rulings on trial management.  The Court granted

13 UPS's request to reopen summary judgment, denied UPS's request to

14 adjust the order of proof, denied UPS's request for leave to re-

15 take Marlo's deposition, and set a filing, hearing, and trial

16 schedule.

17      The parties filed their respective Motions for Summary

18 Judgment to be heard on February 23, 2009.  On March 19, 2009, the

19 Court issued two orders on the parties' motions for summary

20 judgment.  See Doc. Nos. 796, 797.  The Court denied Plaintiff's

21 Motions for Summary Judgment, granted in part and denied in

22 significant part Defendant's Motion for Summary Judgment as to the

23 executive and administrative exemptions, and granted Defendant's

24 Motion as to the Motor Carrier Act defense.  The Court took

25 supplemental briefing on two additional issues raised by the

26 _____

27      [5]Following decertification, over fifty of the former class
   members have brought individual actions to recover for overtime.
28 Those individual actions are proceeding in state court and this
   Court.

parties at the summary judgment hearing, and ultimately issued an order on those issues on May 5, 2009.  See Doc. Nos. 794, 883.

### E.   Trial Preparation

During March and April 2009, the parties filed motions and stipulations regarding evidentiary issues.  The Court granted various stipulations regarding evidence on April 7, 2009.  See Doc. Nos. 848-55.  The Court then issued an order on the parties' motions *in limine* on April 14, 2009.  See Doc. No. 860.  In preparation for the May 5, 2009 trial, the parties worked on various pretrial filings, including jury instructions, exhibits, the pretrial conference order, proposed voir dire, and the special verdict form.  In so doing, the parties engaged in meetings and correspondence with each other and Court staff.

### F.   Trial

Trial began on May 5, 2009 with impanelment, opening jury instructions, and opening statements by both parties.  As framed by the parties, the prior court orders, and IWC Wage Order No. 9, the central issues at trial were: (1) whether Marlo served as a Hub Supervisor from May 6, 2000 to September 30, 2000; (2) whether Marlo was exempt from the requirements of Wage Order No. 9 in each position under either the executive or administrative exemptions; (3) whether UPS made meal periods available to Marlo; (4) whether UPS "authorize[d] and permit[ted]" Marlo to take rest breaks; and (5) if Marlo is owed unpaid wages, the amount he is owed.

Marlo presented his case-in-chief first.  Marlo called various UPS employees as adverse witnesses, including individuals from industrial engineering and management; testified himself as a witness; called other supervisors with whom he worked; and called a

8

1  damages expert. Defendant UPS presented its case second.  In

2  addition to the many witnesses who had testified during Marlo's

3  case-in-chief, UPS also called other management personnel, other

4  UPS employees, and its own damages expert.  Although both parties

5  had time remaining,[6] Marlo did not present a rebuttal case.  On May

6  15, 2009, the parties rested and gave closing arguments.

7       With limited exceptions, the parties generally agreed on the

8  thirty-one jury instructions given, which spanned forty-one pages.

9  The parties also agreed on a nineteen-page Special Verdict Form.

10      After deliberating for a little over three days, the jury

11  returned with a verdict.  The jury found that Marlo was a Hub

12  Supervisor during the disputed period of May 6, 2000 to September

13  30, 2000.  With respect to the period during which Marlo was a Hub

14  Supervisor, the jury found that UPS had satisfied neither the

15  executive exemption nor the administrative exemption.  It found

16  that UPS had not shown that Marlo's duties involved the management

17  of UPS or a customarily recognized subdivision thereof, but had

18  satisfied all of the other factors of the executive exemption.  It

19  also found that UPS had satisfied all but one of the factors for

20  the administrative exemption – the factor regarding Plaintiff's

21  direct assistance of an executive or administrative employee,

22  performance under general supervision of work along specialized or

23  technical lines, or the execution under general supervision of

24  special assignments.  The jury awarded Plaintiff $103,749.67 in

25  unpaid overtime.  The jury also found that UPS had neither

26  authorized and permitted Marlo to take rest breaks nor made

27  _____

28       [6]The parties stipulated to a time limit for witness
    questioning.

available meal periods while Marlo was a Hub Supervisor.   The jury awarded Marlo $10,045.62 total in unpaid premium meal and rest period wages.

With respect to the period during which Marlo was a Preload Supervisor, the jury found that UPS had satisfied neither the executive nor administrative exemptions.   The jury found that Marlo neither exercised discretion and independent judgment nor spent more than 50% of his time on exempt duties, and therefore that he did not qualify for the executive exemption.   The jury also found that Marlo did not qualify for the administrative exemption because (1) he did not customarily and regularly exercise discretion and independent judgment, (2) he did not satisfy the factor regarding Plaintiff's direct assistance of an executive or administrative employee, performance under general supervision of work along specialized or technical lines, or the execution under general supervision of special assignments, and (3) he did not spend more than 50% of his time on exempt duties.   Accordingly, he also did not qualify as an administrative employee.   The jury awarded Marlo $26,752.91 in overtime.   The jury further found that UPS had neither authorized and permitted rest periods nor made meal periods available, and awarded Marlo $22,444.65 for his missed meal and rest periods.

With respect to his time as an On-Road Supervisor, the jury found that UPS had satisfied each of the elements of the executive exemption.   Marlo therefore received no overtime compensation and no compensation for missed meal and rest periods.

G.   **Post-Trial Motions**

1    The parties next filed their post-trial motions.  UPS filed

2  two: a motion for judgment as a matter of law and a motion for a

3  new trial.  Plaintiff also filed two: a motion for restitution

4  pursuant to California Business and Professions Code § 17200 and

5  interest pursuant to California Labor Code § 218.6.  After hearing

6  oral argument, the Court granted Plaintiff's motions and denied

7  Defendant's motions.  The total amount awarded to Marlo from the

8  jury award, restitution, and interest was $249,433.85.

9  **II.  TIMING**

10   UPS first argues that the Court should decline to consider

11  Plaintiff's fee request as a whole because Marlo's Motion for

12  Attorneys' Fees was untimely.  Plaintiff argues that his late

13  filing was the result of excusable neglect and caused no prejudice

14  to UPS.

15   Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B)(I), a

16  motion for attorneys' fees "must[] be filed no later than 14 days

17  after the entry of judgment," "[u]nless a statute or court order

18  provides otherwise."  Fed. R. Civ. P. 54(d)(2)(B)(I); see C.D. Cal.

19  L.R. 54-12 ("Any motion or application for attorneys' fees shall be

20  served and filed within fourteen (14) days after the entry of

21  judgment or other final order, unless otherwise ordered by the

22  Court.").  The fourteen-day period is not jurisdictional, but "the

23  failure to comply with Rule 54 should be sufficient reason to deny

24  the fee motion, absent some compelling showing of good cause."

25  Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 889-90 (9th

26  Cir. 2000)(internal quotation marks and brackets omitted).

27   Federal Rule of Civil Procedure 6 governs the computation of

28  time for motion papers.  According to Rule 6(a), the day of the

1  event that begins the period is excluded from calculation, as is

2  the final day, if it falls on a Saturday or legal holiday.  Fed. R.

3  Civ. P. 6(a)(1),(3).  Intermediate Saturdays and legal holidays are

4  excluded when the period is less than 11 days.  Fed. R. Civ. P.

5  6(a)(2).  Pursuant to Federal Rule of Civil Procedure 6(b)(1)(B),

6  "[w]hen an act may or must be done within a specified time, the

7  court may, for good cause, extend the time . . . on motion made

8  after the time has expired if the party failed to act because of

9  excusable neglect."  Fed. R. Civ. P. 6(b)(1)(B).[7]  "Although

10  inadvertence, ignorance of the rules, or mistakes construing the

11  rules do not usually constitute 'excusable' neglect, it is clear

12  that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic

13  concept' and is not limited strictly to omissions caused by

14  circumstances beyond the control of the movant."  Pioneer Inv.

15  Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 391-92

16  (1993).  In the Rule 60(b) context, "'excusable neglect' is

17  understood to encompass situations in which the failure to comply

18  with a filing deadline is attributable to negligence."  Id. at 394;

19  see id. at 394-95.  A court determining whether delay was excusable

20  may consider as relevant factors "the danger of prejudice to [the

21  opposing party], the length of the delay and its potential impact

22  on judicial proceedings, the reason for the delay, including

23  whether it was within the reasonable control of the movant, and

24  whether the movant acted in good faith."  Id. at 395; see Pincay v.

25  Andrews, 389 F.3d 853, 855 (9th Cir. 2004) (en banc).  Even where a

26

27

28

_____

[7]Rule 6(b)(2) lists exceptions, but Rule 54 is not listed.

1  party misreads a clear rule, the Court should still address the

2  <u>Pioneer</u> factors.  <u>Pincay</u>, 389 F.3d at 856, 858-59.[8]

3      The Court entered Judgment on July 2, 2009.  Plaintiff's

4  Motion for Attorneys' Fees was therefore due on Thursday, July 16,

5  2009.  As Plaintiffs' Motion was filed on July 18, 2009, it was

6  late.

7      On consideration of the <u>Pioneer</u> factors, the Court finds that

8  the circumstances weigh in favor of finding excusable neglect. In

9  Reply,[9] Plaintiff explains that his counsel mistakenly mis-

10  calculated the deadline, <u>see</u> Peters Reply Decl. ¶ 4, and, after

11  realizing the mistake, immediately revised and finalized

12  Plaintiff's Motion for submission the following morning, <u>id.</u> at ¶¶

13  6-7.  Under the circumstances, Plaintiff argues, Plaintiff's

14  neglect was excusable.  The Court agrees.  UPS has not articulated

15  any specific prejudice to it – the parties had previously discussed

16  an attorneys' fees motion and UPS had the benefit of the full time

17  allotted by the Local Rules for a hearing on a regularly noticed

18  motion.  The length of the delay was less than two days, and, given

19  the Local Rules governing noticed motion hearings, did not affect

20  the date of the hearing.  Additionally, there is no indication that

21  Plaintiff did not act in good faith: Plaintiff's counsel has

22  explained the nature of the mistake and has explained that, once he

23

24      [8]The various cases interpreting <u>Pioneer</u> and defining
25  "excusable neglect" do so in the context of the time to appeal,
    Federal Rule of Civil Procedure 60, Rule 6, and the Bankruptcy
26  Rules.

27      [9]The Court notes that Plaintiff did not address the lateness
    of the filing or Rule 6(b) in his Motion.  The Court nevertheless
28  considers the parties' discussion in the Opposition and Reply
    sufficient to raise and address this issue.

1   realized the mistake, he rushed to finalize the filing.  Thus, the

2   first, second, and fourth factors all weigh in favor of finding

3   excusable neglect.  The third factor weighs against excusable

4   neglect: Plaintiff has not suggested that he misread an ambiguous

5   rule, and his explanation of the precise mistake – counting a

6   holiday – shows an approach directly contrary to the plain language

7   of the Rule.  That said, the Court finds the delay *so* brief that

8   the remaining factors weigh the entire inquiry in favor of

9   considering the motion.

10  **III. ATTORNEYS' FEES**

11      Through his motion, Marlo seeks a total of over $5.6 million

12  in attorneys' fees: $3,757,822.50 for work on the case through

13  post-trial motions, $17,948.00 for work on the fee application, and

14  a multiplier of 1.5.  Aside from the timing issues discussed above,

15  UPS does not suggest that attorneys' fees are unavailable to Marlo.

16  It does argue, however, that much of Plaintiff's request is

17  unsupported for a variety of reasons.  UPS suggests that, rather

18  than award attorneys fees for thousands of hours at multi-million

19  dollar total, an appropriate award would be between $1,742.66 and

20  $247,293.33.

21      The Court finds neither party's approach entirely appropriate.

22  As discussed in more detail below, the Court's approach yields a

23  fee award of $1,176,710.50.

24      **A.   Legal Standard**

25      California law governs both the right to a fee and the

26  calculation of the fee.  Mangold v. Cal. Pub. Utilities Comm'n, 67

27  F.3d 1470, 1478-79 (9th Cir. 1995); see Vizcaino v. Microsoft

28  Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) ("Because Washington law

1   governed the claim, it also governs the award of fees.").[10]

2   Pursuant to the California Labor Code, Plaintiff is entitled to

3   attorneys' fees for his successful claims for unpaid overtime and

4   meal and rest period premium wages.  Cal. Labor Code §§ 1194

5   (overtime), 218.5 (wages).

6        California courts use the lodestar method to determine

7   reasonable attorneys' fees.  See Ketchum v. Moses, 24 Cal. 4th

8   1122, 1131-32 (2001) (citing Serrano v. Priest, 20 Cal. 3d 25, 48

9   (1977)).  A court begins with a "touchstone or lodestar figure,

10  based on the careful compilation of the time spent and reasonable

11  hourly compensation of each attorney [] involved in the

12  presentation of the case."  Id. (internal quotation marks omitted).

13  A court should look to "the number of hours the prevailing party

14  reasonably expended on the litigation" and multiply that number "by

15  a reasonable hourly rate."  Morales v. City of San Rafael, 96 F.3d

16  359, 363 (9th Cir. 1996).  As a general rule, unless "special

17  circumstances would render such an award unjust, parties who

18  qualify for a fee should recover for all hours reasonably spent."

19  Meister v. Regents of Univ. of Cal., 67 Cal. App. 4th 437, 447

20  (1998) (internal quotation marks omitted) (emphasis in Meister);

21  id. at 437 n.9 (describing federal and California approaches as "in

22  accord").  Hours reasonably expended can include hours spent

23  briefing and hearing a claim for fees.  Ketchum, 24 Cal. 4th at

24  1133.

25

26  ───────────────────

27       [10]Although the parties emphasize different cases, they do not
    appear to dispute the principles that apply so much as how the
28  Court should exercise its judgment here.  Both parties use federal
    and state cases applying the lodestar approach.

1    The lodestar "may be adjusted by the court based on factors

2  including . . . (1) the novelty and difficulty of the questions

3  involved, (2) the skill displayed in presenting them, (3) the

4  extent to which the nature of the litigation precluded other

5  employment by the attorneys, [and] (4) the contingent nature of the

6  fee award."  Ketchum, 24 Cal. 4th at 1132.  Ultimately,

7  consideration of an adjustment is meant to

8        fix a fee at the fair market value for the particular action.
         In effect, the court determines, retrospectively, whether the
9        litigation involved a contingent risk or required
         extraordinary legal skill justifying augmentation of the
10       unadorned lodestar in order to approximate the fair market
         rate for such services.

11

12  Id. (internal quotation marks omitted); see Morales, 96 F.3d at 363

13  n.8 ("The twelve Kerr factors bearing on the reasonableness are:

14  [¶] (1) the time and labor required, (2) the novelty and difficulty

15  of the questions involved, (3) the skill requisite to perform the

16  legal service properly, (4) the preclusion of other employment by

17  the attorney due to acceptance of the case, (5) the customary fee,

18  (6) whether the fee is fixed or contingent, (7) time limitations

19  imposed by the client or the circumstances, (8) the amount involved

20  and the results obtained, (9) the experience, reputation, and

21  ability of the attorneys, (10) the 'undesirability' of the case,

22  (11) the nature and length of the professional relationship with

23  the client, and (12) awards in similar cases.").  Many of these

24  factors – including (1) novelty and complexity of the issues, (2)

25  the special skill and experience of counsel, (3) the quality of

26  representation, and (4) the results obtained – are subsumed under

27  the lodestar calculation in either the reasonable hours component

28  or the reasonable rate component.  Id. at 364 n.9.

Enhancing multipliers "can range from 2 to 4 or even higher." Wershba v. Apple Computer, Inc., 91 Cal. App. 4th 224, 255 (2001). Where a plaintiff "has achieved limited success or has failed with respect to distinct and unrelated claims, . . . a reduction from the lodestar is appropriate." Hogar v. Comm. Dvpt. Com. of City of Escondido, 157 Cal. App. 4th 1358, 1369 (2007) (citing Hensley v. Eckerhart, 461 U.S. 424 (1983)); see also Sokolow v. County of San Mateo, 213 Cal. App. 3d 231, 249 (1989) ("The issue of whether appellants are entitled to the full amount of their attorney fees request under state law therefore poses a separate question not answerable simply by reference to Hensley v. Eckerhart. . . . However, under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success."). Success can be indicated by the amount of damages recovered, as well as the degree of nonmonetary success in the case. A court has discretion in how to make adjustments it deems necessary; for example, it "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Hensley, 461 U.S. at 436-37.

"A request for attorney's fees should not result in a second major litigation. . . . Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended an hourly rates." Id. at 437.

**B.   Discussion**

The unique posture and history of this case presents complicated questions for the Court in its consideration of attorneys' fees. At the outset, the Court notes that, as a general

matter, attorneys' fees are appropriate: it is undisputed that Marlo succeeded on part of his individual action and recovered both unpaid overtime and meal and rest period premiums.  But the alternatively representative and individual nature of this suit, as well as its particularly lengthy history, make the fee award complex.  The parties' briefs in support of and opposition to this Motion highlight two visions of the case: Marlo's papers emphasize how this case was litigated — the scope of its history, with particular attention to the significant time spent litigating the case as a class action; Defendant's Opposition views this action as it was tried — an individual wage and hour case about whether an employee was misclassified as exempt, with mixed results.  Neither party's approach seems entirely correct: while only Marlo is the prevailing party here, reasonable attorneys' fees for his action do not begin in December 2008.

    A few overarching observations about this case bear on the Court's analysis of an appropriate fee award.  First, this case proceeded as a class action with Marlo as class representative for nearly four of its six years.  When the Court decertified the class, it did *not* do so because the case could under no circumstances proceed as a class action, though the particular legal issues did require an individualized inquiry that affected how the class would need to make its case.  See generally Order Decertifying the Class (Doc. No. 685) (May 19, 2008).  Rather, the Court decertified the class because then-class counsel had proffered an approach that was fundamentally flawed in its presentation of classwide proof, in part because of the inherently individualized inquiry required by the relevant California

18

1    exemptions.  Id. at 24.  Because this case proceeded in significant

2    part as a class action but was ultimately decertified, the

3    partially-representative nature of this case affects the attorneys'

4    fees.  After all, *Marlo* – not the class – is the prevailing party

5    and *Marlo* – not the class – requests attorneys' fees.  Because

6    Marlo was the class representative, however, at least some of the

7    work performed in the context of the class action remained relevant

8    to Marlo's individual action.  Thus, in the manner discussed below,

9    the Court seeks to balance these two procedural postures.

10          Second, this case has been, by all accounts and at all stages,

11   intensely litigated.  Over 1,200 individuals comprised the former

12   class of California Full Time Supervisors, see Order Granting

13   Motion for Class Certification 5 (Doc. No. 67) (June 10, 2004);

14   thus, as a misclassification case, the representative action

15   fundamentally implicated the structure of UPS's employment scheme.

16   After decertification, it appeared to the Court that the parties

17   litigated Marlo's individual action as something of a "bellwether"

18   case for the numerous individual cases brought by former class

19   members pending in this and California state court.[11]  As a result,

20   the hours expended on both sides were undoubtedly significant.

21   Moreover, many of the legal issues the Court addressed throughout

22   the course of the case had sparse jurisprudence, and the inferences

23   to be drawn from the facts of the case were not clear.[12]

24   _____

25          [11]At oral argument, the parties disagreed as to whether the
     case has been followed in the other cases.  Regardless, as the
26   first of potentially dozens of full-time supervisor cases in all
     (and upwards of ten pending in this Court), the Court considers
27   this case to have been litigated with particular intensity.

28          [12]For all of these reasons, the Court finds unpersuasive
                                                        (continued...)

1    With those overarching points as a backdrop, the Court turns

2   to the specifics of the fee request.

3           1.   Lodestar

4    The Court begins by assessing Plaintiff's requested lodestar.

5   Plaintiff requests fees for a total of 9,379.62 hours of attorney

6   time and 44.87 hours preparing the fee motion at an hourly rate of

7   $325 to $575 for the seven attorneys who performed work for

8   Plaintiff in this case.

9           a.   Hours Reasonably Expended

10    The Court first addresses the hours reasonably expended by

11   Plaintiff's counsel in this case.  UPS challenges Plaintiff's

12   "reasonable hours" in three principal ways.  First, while Plaintiff

13   does not distinguish between hours counsel expended litigating this

14   case on behalf of the class and hours spent litigating for Marlo

15   only, UPS argues that Plaintiff is not entitled to hours expended

16   on the class action portion of the litigation.  Second, UPS

17   challenges Plaintiff's submission of reconstructed records.  Third,

18   UPS argues that certain hours should be excluded as duplicative,

19   block-billed, and/or vague.

20    Rather than make sweeping cuts by way of percentages, the

21   Court has reviewed each entry in the over 200 pages of itemized

22   time-sheets submitted by Plaintiff in support of his Motion, as

23   well as UPS's specific objections to each entry in the voluminous

24   submissions.  See Abele Decl., Exs. C-E.  Although the Court will

25

26       [12](...continued)

27   Marlo's emphasis on Defendant's refusal to settle the case.  That
     said, the nature of this case leaves the Court hesitant to find the
28   hours expended by Marlo's counsel in litigating particular issues
     or motions unnecessary, excessive, or duplicative.

1    not address every entry individually in this Order, the Court

2    explains below the approach it used to eliminate or include certain

3    types of hours, and the resulting lodestar.

4                        i.    Reconstructed Records

5          First, the Court addresses Defendant's general challenge to

6    Plaintiff's submission of reconstructed records.  See Opp'n at 12-

7    14 & nn. 9-10.  In support of his motion, Marlo submits the

8    declaration of attorney John Furutani, who documents the hours

9    expended on this litigation by himself and Mark Peters through the

10   law firm Furutani & Peters.  Furutani explains that the time-

11   keeping system employed by Furutani & Peters for most of the case

12   lost certain data when Furutani changed over the computer system in

13   2008.  Furutani Decl. ¶ 8.  To reconstruct the records, Furutani

14   "retained an administrative assistant . . . to retrieve the time

15   keeping information still available in [the firm's] prior system,

16   and combine it with the filed events in this case, pursuant to the

17   Court's docket."  Id.  Furutani then "personally went through the

18   spreadsheet and checked the time entries that were retained for

19   accuracy, and added additional missing entries for tasks related to

20   filings with the Court that were now unaccounted for as a result of

21   the loss of data from [the] old system."  Id.  Furutani explains

22   that "the majority of time spent" by Peters and Furutani "on the

23   extensive volumes of correspondence with witnesses, opposing

24   counsel and Mr. Marlo on this case."  Id. at ¶ 9.  As a result,

25   both Furutani and Peters estimate that the requested hours "are

26   extremely conservative and in fact represent less than 75% of the

27

28

                                   21

1    hours actually expended" by Furutani & Peters in litigating the

2    case.  Id.; Peters Decl. ¶ 4.[13]

3        UPS argues that the reconstructed billing records are

4    insufficient in this case because Furutani has not provided the

5    underlying notes he used to reconstruct the records.  The Court

6    disagrees, and declines to ignore the records on these grounds.

7    "The lack of contemporaneous records does not justify an automatic

8    reduction in the hours claimed, but such hours should be credited

9    only if reasonable under the circumstances and supported by other

10   evidence such as testimony or secondary documentation."  Frank

11   Music Corp. v. Metro-Goldwyn-Mayer Inc., 886 F.2d 1545, 1557 (9th

12   Cir. 1989); see Bernardi v. County of Monterey, 167 Cal. App. 4th

13   1379, 1398 (2008); see also Intel Corp. v. Terabyte Int'l, Inc., 6

14   F.3d 614, 623 (9th Cir. 1993) (explaining that particularly where

15   "the requesting party submits mere summaries of hours worked," it

16   is inappropriate for the district court to award fees "without

17   elaboration" and the specific hours claimed must be made

18   available).  Furutani has explained how the records were

19   reconstructed and has testified to their accuracy and that any

20   estimates were conservative.  Additionally, the records are

21   itemized such that the Court can analyze whether entries are

22   reasonable.

23                    ii.  Duplicative, Excessive, Vague, or Block-

24                         Billed Records

25   _____

26       [13]Marlo also submits the Declaration of Mark Peters, who
     attaches an invoice of the time spent by his current firm,
27   Duckworth, Peters & Lebowitz, LLP, litigating the case.  Those
     records begin in October 2007.  See Peters Decl., Ex. A.  These
28   records are not the subject of Defendant's "reconstructed records"
     challenge.

1    UPS also argues that the Court should exclude or reduce

2  certain entries on the ground that those entries are duplicative or

3  excessive, vague, and/or block-billed.  The Court has reviewed *all*

4  of the entries submitted by Plaintiff, and has specifically

5  considered whether entries identified by Defendant as duplicative

6  or excessive should be excluded or reduced on that ground.  The

7  Court is not convinced that in the context of this case – with its

8  factual complexity and the intense nature of the advocacy from both

9  parties – most of the identified hours are duplicative or

10 excessive.  First, the Court considers it neither duplicative nor

11 excessive for the two attorneys working on the case to each review

12 (and, likely, research the legal and factual accuracy of) opposing

13 counsel's filings in the case.  See Opp'n at 15.  From the Court's

14 experience, the parties' filings tended to involve thorough,

15 nuanced legal argument proffered by experienced counsel and

16 supported by numerous declarations; the Court does not consider the

17 time spent reviewing Defendant's summary judgment filings or other

18 filings to be excessive or duplicative.  Additionally, it is not

19 unreasonable for Marlo to have more than one attorney at a

20 deposition.  The Court reduces the hours for Furutani and Peters by

21 a total of 24 hours for attendance at depositions in the following

22 manner: (1) for February 24, 2004, the Court eliminates 10 hours

23 total as excessive; (2) for August 9, 2004, the Court eliminates 1

24 hour as excessive; (3) for August 20, 2004, the Court eliminates 2

25 hours as excessive; (4) for August 20, 2004, the Court eliminates 1

26 hour as excessive; (5) for September 9 and 10, 2004, the Court

27 eliminates a total of 8 hours as excessive; and (6) for March 8,

28 2005, the Court eliminates 2 hours as excessive.

1    UPS argues that block billing by Marlo's attorneys warrants a

2    reduction in the reasonable hours billed.  Block billing is "the

3    time-keeping method by which each lawyer and legal assistant enters

4    the total daily time spent working on a case, rather than itemizing

5    the time expended on specific tasks." Welch v. Metropolitan Life

6    Ins. Co., 480 F.3d 942, 945 n.2 (9th Cir. 2007). It can be

7    appropriate to take a reduction of 25% on hours due to block

8    billing.  Id. at 948.  That said, a reduction for block-billing

9    should be tied to the risks attendant to the practice: the

10   important thing is that "sufficient detail has been provided so

11   that [the Court] can evaluate what the lawyers were doing and the

12   reasonableness of the number of hours spent on those tasks." Smith

13   v. District of Columbia, 466 F. Supp. 2d 151, 158 (D.D.C. 2006).

14   Here, the Court considers the hours submitted detailed enough for

15   the Court to evaluate what the lawyers were doing and the

16   reasonableness of the hours spent on those tasks.  The Court finds

17   a reduction for block billing inappropriate.

18   Additionally, UPS argues that "vague" descriptions hinder the

19   Court's ability to assess the reasonableness of the claimed hours.

20   See Winiger v. SI Mgmt. L.P., 301 F.3d 1115, 1126 (9th Cir. 2002).

21   The Court has reviewed each of the entries identified by UPS as

22   vague.  Those objections are focused on entries for reviewing

23   documents and legal research.  While there is some merit to these

24   objections, the Court finds that a reduction or elimination of

25   these hours is not warranted.  Given the volume of documents

26   produced in this case (according to Plaintiff, that volume totals

27   over 100,000 pages in addition to thousands of pages of electronic

28   data) and the many substantive motions filed, the Court finds that

1    the aggregate respective time spent on reviewing documents and

2    conducting legal research to be reasonable.  However, the Court

3    eliminates 7.3 Peters hours as either unclear as to the biller or

4    referencing non-<u>Marlo</u> litigation after decertification (and

5    therefore not eliminated as discussed in subsection (iii), below).

6                       iii.  Time Spent Litigating the Class Action

7         More fundamentally, UPS argues that Marlo cannot recover

8    attorneys' fees for the time spent litigating this action as a

9    class action.  Specifically, UPS suggests that, aside from Marlo's

10   deposition, Plaintiff cannot recover for *any* time spent on this

11   case prior to December 11, 2008, when the Court issued its order

12   returning the case to its active caseload.  <u>See</u> Opp'n at 19; Doc.

13   No. 702 (December 11, 2008).  Marlo generally does not distinguish

14   between time spent litigating the class action and time spent

15   litigating his individual action.

16        As mentioned above, this issue presents the Court with a

17   complicated task that potentially affects a significant portion of

18   the claimed fees.  "[T]o calculate the lodestar amount, the

19   district court should multiply the number of hours *reasonably* spent

20   *in achieving the results obtained* by a reasonable hourly rate."

21   <u>Winiger</u>, 301 F.3d at 1125 (internal quotation marks and alterations

22   omitted)(emphasis in <u>Winiger</u>).  The prevailing plaintiff-employee

23   here is *Marlo* – not the class.  Thus, hours spent working solely on

24   class-related issues are not recoverable.  Because Marlo was the

25   class representative and because many of the substantive (as

26   distinguished from procedural) legal issues have been consistent

27   whether this case was in the pre-certification, certified, or

28   decertified phase, it is not the case that *all* of counsel's time

prior to December 11, 2008 is not uncompensable.  For example, since the Court's December 11, 2008 order denied the portion of Defendant's motion that sought to reopen discovery, all discovery in this case, including that used in trial, was obtained prior to December 2008.  Many of the individuals who were deposed in 2003 and 2004 were witnesses in either the February 2009 summary judgment motions or at the trial.  Additionally, the legal issues underlying the executive and administrative exemptions have been a part of this case since its inception.

In seeking to find an appropriate balance, the Court has reviewed *each* of the individual entries and, drawing as a supplement on its experience and familiarity with this case over the past six years, the Court eliminates a significant portion of those hours in the following manner.  First, the Court eliminates all hours related to briefing and researching the motions for certification and decertification, the interlocutory appeals of both orders, time clearly billed for contacts with class members, and time spent on creating notice to the class.[14]  The Court generally does *not* eliminate hours expended on discovery during this period – including document review and depositions – with the exception of that time billed for (1) clearly class-related discovery such as studies and surveys and (2) experts prior to December 11, 2008.  Although the Court recognizes that the remaining hours may have been expended in part on class-related work, the Court has erred on the side of compensating Marlo for

---

[14]In addition to the time spent by Furutani and Peters, the Court notes that some of the time billed by Moscone, Emblidge & Quadra related to class issues, particularly decertification.

1   that time at the lodestar-calculation step because it appears to

2   the Court that they were expended at least in part on Marlo, as the

3   class representative.   The Court does not compensate Marlo,

4   however, for discovery-related motions, which tended to center on

5   the representative posture of the case.[15]

6       Second, the Court eliminates the majority of the time billed

7   for summary judgment motions during the class period.   The Court

8   does so because the summary judgment motions centered fundamentally

9   on the issue of classwide proof, even though assessed against a

10  different procedural standard.   The Court recognizes that the class

11  was successful in appealing the grant of summary judgment against

12  it, and notes that the appeal was necessary for Marlo to preserve

13  his claim.   Ultimately, however, the Court reiterates that the

14  appeal was largely taken on behalf of the class, and centrally

15  involved class issues.   The Court therefore eliminates the vast

16  majority of hours spent on the appeal as well.   That said, the

17  Court does not eliminate the *entirety* of the hours spent litigating

18  pre-December 2008 summary judgment issues and appeal.   The Court

19  allows recovery for legal research on the exemptions (at both the

20  summary judgment stage and on appeal) and limited drafting of the

21  summary judgment motions,[16] which reasonably carried over to the

22  later briefing of these issues in Marlo's individual action.   Aside

23  from some exemption-specific legal research, the Court eliminates

24

25

26      [15]The Court notes that it did not rely on Defendant's
27  designation of which billed actions were part of the class
    litigation, but rather conducted an independent review.

28      [16]The Court addresses the Motor Carrier Act hours below.

the vast majority of the time spent litigating the appeal,[17] as the 2005 summary judgment order did not resolve Marlo's individual claim.[18]

Third, the Court eliminates time spent litigating discovery and sanctions for UPS in March through June of 2005.  As part of the sanctions process, UPS already paid attorneys' fees for this period.

### iv.  Court's Reasonable Hours

On the basis of the Court's review of the entries and applying the approach discussed above, the Court finds that an appropriate lodestar reflects the following hours reasonably expended on Marlo's case:[19]

| Firm/Attorney | Requested Hours | Court's Lodestar |
|---|---|---|
| Furutani & Peters – John Furutani and Mark Peters | 7,269.6 | 2,857.3 |

---

[17]With respect to the appeal, in addition to the records in the Furutani and Peters Declarations, the Court has reviewed the Emblidge Declaration and Defendant's comments thereon. See Emblidge Decl. ¶¶ 14-18, Ex. A; Abele Decl., Ex. E.  The Court has reduced these fees in the manner indicated below.

[18]The parties dispute whether the 2005 summary judgment rulings and appeal addressed Marlo specifically.  Marlo emphasizes that the *judgment* purports to adjudicate Marlo's individual claim. UPS notes that the briefing on which the Court ruled here and in front of the Ninth Circuit addressed the class claims, not Marlo's claim.  The Court agrees that the appeal, like the Court's summary judgment order, was class-focused.  To the extent the judgment mistakenly appeared to adjudicate Marlo's claim against him, the appropriate individual motion would have been one for relief under Federal Rule of Civil Procedure 60.  This case frankly was not proceeding as an individual action during the appeal.

[19]The Court separates attorneys here by requested billing rate.

| Duckworth, Peters & Lebowitz, LLP - Mark Peters | 1,404.38 | 739.51 |
|---|---|---|
| Moscone, Emblidge & Quadra ("MEQ") - Scott Emblidge | 113.94 | 3.12 |
| MEQ - Rachel Sater and Andrew Sweet | 310.25 | 41.71 |
| MEQ - Sylvia Sokol | 34.50 | 5.1 |
| MEQ - Samantha Zutler | 113.76 | 11.29 |

The Court has also reviewed Plaintiffs' submissions regarding reasonable hours spent on the Motion for Attorneys' Fees. Plaintiff seeks 44.87 hours for preparing the fee application. The Court has reviewed the submissions and Defendant's specific objections, and finds those claimed hours reasonable.

        b.   Reasonable Hourly Rate

The reasonable hourly rate reflects a "balance between granting sufficient fees to attract qualified counsel to civil rights cases . . . and avoiding a windfall to counsel." Moreno, 534 F.3d at 1111. Accordingly, the court "compensate[s] counsel at the prevailing rate in the community for similar work; no more, no less." Id.

Marlo submits evidence supporting the requested hourly rates. See Locker Decl. ¶ 12; Harris Decl. ¶ 9; deRubertis Decl. ¶¶ 15-19; Emblidge Decl. ¶¶ 8-13. UPS does not aim its Opposition at contesting those rates. The Court is satisfied that Plaintiff has satisfied his burden to show that the requested rates are

29

reasonable.   Thus, the Court finds that the following rates are reasonable:

| Attorney | Rate |
|---|---|
| John Furutani | $400.00 |
| Mark Peters | $400.00 |
| Scott Emblidge | $575.00 |
| Rachel Sater | $475.00 |
| Andrew Sweet | $475.00 |
| Sylvia Sokol | $425.00 |
| Samantha Zutler | $325.00 |

### c.   Initial Lodestar

The Court's findings as to reasonable hours and reasonable rates yields a lodestar of $1,484,115.00, in the following manner.

| Reasonable Rate | Reasonable Hours | Lodestar Figure |
|---|---|---|
| $400.00 | 3,641.68 | $1,456,672.00 |
| $575.00 | 3.12 | $1,794.00 |
| $475.00 | 41.71 | $19,812.25 |
| $425.00 | 5.1 | $2,167.50 |
| $325.00 | 11.29 | $3,669.25 |
| | **Total** | $1,484,115.00 |

### 2.   Adjustment of Lodestar

Although the lodestar enjoys a strong presumption that it represents the proper fee, see Jordan v. Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987), it can be appropriate to adjust the fee in some circumstances.

Where a party seeks a fee enhancement, "the trial court is not required to include a fee enhancement to the basic lodestar figure

1  for contingent risk, exceptional skill, or other factors, although

2  it retains discretion to do so in the appropriate case; moreover,

3  the party seeking a fee enhancement bears the burden of proof."

4  Ketchum, 24 Cal. 4th at 1138.  The trial court should "should not

5  consider these factors to the extent they are already encompassed

6  within the lodestar," such as the difficulty of a legal question

7  and the quality of representation.   Id.

8       A reduction for limited success can be appropriate in some

9  circumstances where a plaintiff succeeds on some claims but not

10  others.  The central question in such a case is the relatedness of

11  the claims.  Where a plaintiff presents in one lawsuit "distinctly

12  different claims for relief that are based on different facts and

13  legal theories," Hensley, 461 U.S. at 434, "work on an unsuccessful

14  claim cannot be deemed to have been expended in pursuit of the

15  ultimate result achieved," id. at 435 (internal quotation marks

16  omitted).  On the other hand, where "the plaintiff's claims for

17  relief . . . involve a common core of facts or [are] based on

18  related legal theories," "[m]uch of counsel's time will be devoted

19  generally to the litigation as a whole, making it difficult to

20  divide the hours expended on a claim-by-claim basis."  Id.  In such

21  a case, the district court should not view the claims as a "series

22  of discrete claims" but rather "should focus on the significance of

23  the overall relief obtained by the plaintiff in relation to the

24  hours reasonably expended on the litigation."  Id.   That said, a

25  court has discretion in how to reduce an unreasonably high award.

26  Id. at 436-37.

27       Both parties request that the Court adjust the lodestar in

28  this case.  UPS requests a downward adjustment on the basis of the

degree of success obtained in the action.   In addition to the class action issues discussed above,[20] UPS argues that the lodestar should be adjusted downward to account for limited success on (1) the Motor Carrier Act claim, (2) the On-Road Supervisor position, and (3) limited monetary damages in comparison to those sought for the class overall.   Marlo seeks an enhancement of the lodestar through a multiplier of 1.5.   According to Marlo, an enhancing multiplier is appropriate because of (1) contingent risk, (2) preclusion of other work, (3) difficulty of the issues and skill displayed in presenting them, and (4) the results obtained.   As discussed in more detail below, the Court reduces the award to account for the On Road Supervisor position and the Motor Carrier Act exemption, and the Court declines to apply an enhancing multiplier.

> a.   Issues Included in Lodestar

Marlo argues that the difficulty of the issues, the skill displayed, the preclusion of other employment opportunities, and the contingent risk involved in this case.   In calculating the lodestar, the Court has already accounted for the difficulty of the

---

[20]UPS frames the class action issue, the MCA issue, and the On-Road Supervisor issue as all bearing on degree of success.   The Court finds it more helpful to separate the hours expended on the class action from those spent for Marlo when determining hours reasonably spent on Marlo's case, and to consider the degree of success with respect to the Motor Carrier Act and the On-Road Supervisor positions when deciding whether the adjust the lodestar. The Court notes, however, that the practical results of either approach are the same: were the Court to consider class issues in determining whether to adjust the lodestar (the approach some courts have taken), the Court would do so by cutting particular hours related to class litigation, which was ultimately unsuccessful.   Likewise, the Court would cut the majority of the class-related summary judgment fees as largely related to classwide proof.

1  issues and the skill displayed through its calculation of

2  reasonable hours and reasonable rates.  Additionally, although the

3  Court finds it likely that Plaintiff's counsel was forced to turn

4  away other work in light of the significant hours billed, the Court

5  considers the preclusion of other work to be built into the

6  reasonable hours expended on the case.  See Robbins v. Alibrandi,

7  127 Cal. App. 4th 438, 454 (2005) (warning against applying a

8  multiplier for preclusion of work absent an affirmative showing of

9  the work turned away because otherwise "a multiplier would be

10 appropriate in any lodestar type of case, since it is axiomatic

11 that time spent by individual attorneys on one case prevents them

12 from spending time on another").

13              b.   Results Obtained

14     Both parties argue that the results in this case weigh in

15 their favor: UPS argues that its success on the Motor Carrier Act

16 and On-Road Supervisor positions justify a reduction in the

17 lodestar, while Marlo argues that a favorable judgment of

18 $249,433.85 "[d]espite the overwhelming disparity in resources

19 between the two sides" is an exceptional result.  The Court

20 declines to impose either an enhancement or a reduction on the

21 basis of the results.

22              i.   No Enhancement

23     The Court declines to award an enhancement on the basis of the

24 judgment obtained.  Success in the face of disparate resources, in

25 and of itself, does not make an award exceptional. Rather, "a trial

26 court should award a multiplier for exceptional representation only

27 when the quality of representation far exceeds the quality of

28 representation that would have been provided by an attorney of

comparable skill and experience." <u>Ketchum</u>, 24 Cal. 4th at 1139. That Marlo prevailed on two of the three positions cannot be considered "exceptional" in the context of the relief he sought in his individual action: Marlo did not succeed in the position in which he spent most of his time, as the Court granted summary judgment on the Motor Carrier Act against Marlo and the jury found that he was exempt under the executive exemption as an On Road Supervisor.

ii.   Limited Reduction for On-Road Supervisor
Position and Motor Carrier Act

UPS argues that Marlo's failure to succeed on the On-Road Supervisor position in front of both the jury (on the executive and administrative exemptions) and the Court (on the Motor Carrier Act) justifies a reduction for limited success.  As discussed above, a plaintiff may not recover attorneys' fees for time spent on unsuccessful claims that are unrelated to a plaintiff's successful claim.  <u>See</u> <u>McCown v. City of Fontana</u>, 565 F.3d 1097, 1103 (9th Cir. 2009).  A court "should not attempt to divide the request for attorney's fees on a claim-by-claim basis," however, where "the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories.'" <u>Id.</u> (quoting <u>Hensley</u>, 461 U.S. at 435).  That said, even if the claims are related, a court must consider whether "'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award,'" <u>id.</u> (quoting <u>Hensley</u>, 461 U.S. at 434), and must reduce an unreasonably high award.

It is undisputed that Plaintiff did not succeed in obtaining unpaid overtime or compensation for missed meal and rest periods for the time he served as an On-Road Supervisor.  In an Order dated March 19, 2009, the Court granted summary judgment in favor of UPS on the issue of whether Marlo fell under the Motor Carrier Act exemption from overtime while he was serving as an On-Road Supervisor.  Additionally, at trial, the jury found that Marlo was exempt under the executive exemption while he was an On-Road Supervisor.  Thus, although Marlo technically succeeded in part on each of his causes of action, his success was limited in that he recovered on two of the three supervisor positions.  The Court must determine whether a reduction to account for that mixed success is appropriate.

First, the parties debate the "relatedness" of the On-Road Supervisor position and the Motor Carrier Act issues to the supervisor positions on which Marlo was successful.  Marlo argues that he succeeded on each statutory claim he alleged – for overtime, for missed meal and rest periods, for restitution, *et cetera*.  Citing the Court's order denying Defendant's Motion for a New Trial, UPS emphasizes that different evidence was presented as to each different position, and argues that posture should govern the Court's decision as to whether the claims are "related."  Additionally, Defendant argues that the Motor Carrier Act involved different legal and factual considerations.

The Court finds the claims "related" under the definition provided by Hensley and McCown, though the Court also considers the issues separable to some extent.  With respect to separating the On-Road Supervisor positions from the other two positions, the

nature of Marlo's employment at UPS formed the common core of facts
underlying all of the positions in this case, and each position
involved overlapping issues regarding the credibility of corporate
executives, record-keeping, and the use of procedures.  In other
words, many of the underlying factual issues were consistent
through all three positions.  Additionally, to the extent all three
positions involved the executive and administrative exemptions, the
overlapping legal theories makes these claims "related" under the
Hensley framework.  At the same time, UPS correctly points out that
each of the positions was different in that they involved different
duties and some different witnesses; UPS was required to prove its
case on each supervisor position, and the evidence justified
different jury findings on each.  Under the Hensley "relatedness"
analysis, however, these positions and the executive and
administrative legal issues are sufficiently overlapping that they
must be deemed "related."

The Motor Carrier Act exemption perhaps provides the most
compelling basis for division.  The legal issues presented by the
Motor Carrier Act are largely distinct from the executive and
administrative exemptions: while the executive and administrative
exemptions involved a partially-overlapping list of six and five
factors, respectively,[21] the application of the Motor Carrier Act
was based on the extent to which Marlo was engaged in safety-
related activities (i.e., driving) in interstate commerce.[22]  In a

_____

[21] See IWC Wage Order No. 9, Cal. Code Regs. tit. 8, § 11090(1)(A)(1)-(2).

[22] See  Order (1) Granting Defendant's Motion for Partial Summary Judgment as to the Motor Carrier Act Exemption, (2) Denying
(continued...)

similar vein, the Motor Carrier Act almost entirely briefed separately from the administrative and executive exemptions.  That said, while certain of the factual and legal issues were distinct, the factual issue of the extent to which Marlo was driving was relevant to both the Motor Carrier Act and the "primarily engaged" element of the executive and administrative exemptions, as driving would have been appropriately categorized as "non-exempt" work.  The Court therefore finds the issues factually related, but separable in terms of legal research and briefing.  Overall, the Court finds the On-Road Supervisor position "related" under Hensley and its progeny.

    The Court does not consider the lodestar amount reasonable in light of the results obtained, however.  See Hensley, 461 U.S. at 434.  In making this overall determination, the Court considers (1) Plaintiff's recovery, (2) the purpose of fee-shifting statutes such as this one, and (3) whether the results obtained likely have a broader significance beyond this individual case.  With respect to a plaintiff's recovery, the difference between the amount received and the damages sought is relevant, though it is not the "sole indicator" of a plaintiff's success.  See Morales, 96 F.3d at 364.  Additionally, under California law, apparent disproportionality between the fees sought and the amount recovered for the plaintiff is not in and of itself a reason to reduce an award.  See Jefferson v. Chase Home Finance, 2009 WL 2051424 *3-4 (N.D. Cal. July 10,

------

[22](...continued)
Plaintiff's Motion for Summary Judgment as to the Motor Carrier Act Exemption, and (3) Denying in Part and Sustaining in Part Plaintiff's Request for Sanctions and Objections to Evidence (Doc. No. 798) at 8-31 (March 19, 2009).

2009).  Moreover, the statutes granting attorneys' fees are meant
to encourage the litigation of fees in a situation like this one
and limiting a fee award to an amount less than that reasonably
incurred in prosecuting such a case would undermine those goals.
Cf. Hayward v. Ventura Volvo, 108 Cal. App. 4th 509, 512 (2003); Vo
v. Las Virgenes Municipal Water Dist., 79 Cal. App. 4th 440 (2000).
Finally, whether the results obtained likely have a broader impact
is particularly relevant where the fees sought seem significantly
greater than a plaintiff's recovery.  See Morales, 96 F.3d at 364-
65.

     Here, these considerations lead the Court to conclude that the
lodestar is unreasonably high and that a limited reduction is
necessary.  As mentioned above, although Marlo was successful on
two of the three positions, UPS proved its affirmative defense with
respect to the position on which Marlo spent the most time and for
which he sought the greatest recovery.  His ultimate individual
recovery was significantly less than that which he sought.  The
question of whether these results have broader significance is
mixed, and ultimately unclear at this point.  This case was not
resolved on a classwide basis.  Additionally, even as an individual
action, it does not resolve, for example, the legality of a
widespread practice.  The individualized focus on Marlo at trial
may make the factual findings of this case not only non-binding but
also generally inapplicable to others.  Yet, as mentioned above,
the parties litigated this case fiercely and it was the Court's
impression that they did so in part because it was the first of
many.  In a similar vein, at least some of the issues provided
questions of law on which there was limited, if any, guidance, and

those decisions may provide guidance in the future.  Although the complexity of the case has been accounted for in the lodestar, the relationship between that complexity, the context of the case, and its place as the first of many cases is also relevant to whether a fee is "reasonable" in light of the results obtained. Additionally, the Court is mindful of the role of attorneys' fee statutes-the Court is wary of disincentivizing potential plaintiffs from prosecuting tough, ultimately partially-meritorious wage-and-hour cases against formidable opponents, when the fee-shifting provision of the statute seeks to do precisely the opposite.

With those considerations in mind, the Court's holistic review finds the lodestar amount unreasonably high.  Those same considerations suggest that only a limited reduction in the award is appropriate.

The Court has discretion in how to reduce an unreasonably high award.  See Hensley, 461 U.S. at 436-37 ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.").  Here, the Court finds that the most appropriate way to reduce the fee to account for this limited success is to eliminate certain hours.  Because of the overlapping nature of many of the issues, the Court finds a sweeping percentage reduction would be too drastic a cut of the attorneys' fees or would be inherently arbitrary.  Instead, the Court takes the following approach.  First, the Court eliminates one-third of the time spent on discovery.  The Court considers a

1   cut of one-third of these hours to be appropriate here because

2   while many of the discovery issues overlap, the parties put on

3   different proof for each position.  At least some portion of

4   discovery related to the On-Road Supervisor position only.  The

5   Court finds one-third to represent an appropriate balance between

6   (1) the fact that Marlo won on two of the three positions, (2) the

7   overlapping nature of many of the factual issues involved in all

8   three positions, (3) the individual nature of each position, (4)

9   the failure of Plaintiff to separate out discovery for each

10  position (which made a more precise identification of hours

11  impossible), and (5) the fact that Marlo spent the majority of the

12  relevant employment period as an On Road Supervisor and sought the

13  majority of his individual relief in that position.  The third and

14  fifth factors point toward a reduction that tracks the percentage

15  of time or recovery Marlo sought on the On Road Supervisor position

16  as compared to the other two positions; the first and second

17  factors suggest that reduction approaching 60% would be too great;

18  and the fourth factor explains why the Court takes a limited

19  percentage approach.  The Court focuses on *discovery* hours here

20  because (1) the legal issues surrounding the executive and

21  administrative exemptions overlapped entirely with the other two

22  positions and (2) the Court addresses the legal issues surrounding

23  the Motor Carrier Act exemption separately.  Second, the Court

24  eliminates hours spent on legal research and briefing of the Motor

25  Carrier Act exemption, which applied only to the On-Road Supervisor

26

27

28

40

1  position.[23]   Taken together, these two cuts eliminate 765.02 total

2  hours, and decrease the lodestar by $307,404.50.[24]

3                    c.   Contingent Risk and Delay of Payment

4       According to the California Supreme Court, a trial court need

5  not include a fee enhancement for contingent risk, exceptional

6  skill, or other factors.  See Ketchum, 24 Cal. 4th at 1138.  A

7  court has the discretion to apply a multiplier, however, in light

8  of the "the contingent nature of the fee award, both from the point

9  of view of eventual victory on the merits and the point of view

10 establishing eligibility for an award." Serrano, 20 Cal. 3d at 49.

11 The purpose of the inquiry, in part, "is to determine a fee that is

12 likely to entice competent counsel to undertake difficult public

13 interest cases." Crommie v. State of Cal., Public Utilities Com'n,

14 840 F. Supp. 719, 725 (N.D. Cal. 1994).   Ultimately, the Court's

15 goal in making any adjustment is to "fix a fee at the fair market

16 value for a particular action." Ketchum, 24 Cal. 4th at 1132.  A

17 contingent fee may be "higher than a fee for the same legal

18 services paid as they are performed.  The contingent fee

19 compensates the lawyer not only for the legal services he renders

20 but for the loan of those services." Amaral v. Cintas Corp. No. 2,

21 163 Cal. App. 4th 1157, 1217–18 (2008) (quoting and citing

22 Ketchum).  Where "[t]he claims and defenses in [a] case raised a

23 significant number of complex legal issues of first impression, and

24 class counsel took a substantial risk that it would not prevail on

25

26       [23]The court is careful only to eliminate hours that it did not
27 already eliminate in calculating the lodestar.

28       [24]This reflects a reduction by 746.43 hours of those billed by
John Furutani and Mark Peters, and 18.59 hours billed by MEQ.

1  these issues and thus would not recover a full fee," a court is

2  justified in applying a multiplier for contingency risk.  Id.

3       The Supreme Court has described contingent risk as "the

4  product of two factors: (1) the legal and factual merits of the

5  claim, and (2) the difficulty of establishing those merits."  City

6  of Burlington v. Dague, 505 U.S. 557, 562 (1992).  The second

7  factor "is ordinarily reflected in the lodestar – either in the

8  higher number of hours expended to overcome the difficulty, or the

9  higher hourly rate of the attorney skilled and experienced enough

10  to do so."  Id.  The Ninth Circuit has explained that "[a] district

11  court generally has discretion to apply a multiplier to the

12  attorney's fees calculation to compensate for the risk of

13  nonpayment."  Fischel v. Equitable Life Assur. Soc'y of U.S., 307

14  F.3d 997, 1008 (9th Cir. 2002).  It is an abuse of discretion to

15  fail to apply a multiplier "when (1) attorneys take a case with the

16  expectation that they will receive a risk enhancement if they

17  prevail, (2) the hourly rate does not reflect that risk, and (3)

18  there is evidence that the case was risky."  Id.  Additionally, it

19  is an abuse of the Court's discretion to decline to apply a

20  multiplier "when the fee applicant establishes that the prevailing

21  party would have faced 'substantial difficulties' in finding

22  counsel without an adjustment for risk and that it is difficult to

23  find counsel for this class of contingency fee cases."  Id. at n.8.

24  But see Dague, 505 U.S. at 563 (discussing problems with that

25  approach).

26       The Court declines to apply a contingency multiplier here.

27  Plaintiff has made no showing as to the difficulty of finding

28  counsel or an expectation of a contingency enhancement at the time

1  counsel took this case in light of the hourly rates charged.

2  Although a few of the declarations explain the general risks

3  involved in contingency cases and the role that enhancements could

4  play in minimizing those risks, the Court does not find those

5  arguments particularly persuasive here.  The Court recognizes that

6  this case involved considerable risk from its inception, and was a

7  case that got riskier for Plaintiff's counsel as the case

8  progressed.  The Court has accounted for the complexity of the

9  issues both in the hours deemed reasonable in calculating the

10  lodestar and in determining the balance between the fee recovery

11  and the results obtained.  In that determination, the Court also

12  considered the ways in which the public interest is served by

13  encouraging counsel to take and to continue complex cases.  The

14  fee-shifting provision largely performs that function, and the

15  Court's limited reduction similarly accounts for it.[25]

16              3.   Summary of Fees Awarded

17       The Court cannot envision an approach that would perfectly

18  allocate attorneys' fees in this case, even if the Court were to

19  turn it into a second wave of litigation.  See Hensley, 461 U.S. at

20  437.  The Court considers its approach to be a balance of various

21  complexities raised by the history of this case.  The Court has

22  engaged in a detailed review of the specific entries submitted and

23  has considered the propriety of the requested fees in light of the

24  parties' arguments and briefing, the complex history of this case,

25

26       [25]In its Opposition, UPS argued that "there was no need to
    incentivize Marlo's counsel to undertake a simple, individual wage-

27  hour claim that quickly could have been resolved by the Labor
    Commissioner years ago."  Opp'n at 20.  As UPS recognized at oral

28  argument, this argument lacks persuasive force: Marlo *did* bring his
    claim before DLSE, which rejected the claim as too complex.

and the Court's intimate experience with this case over the past six years.  As discussed above, the Court begins with a lodestar of $1,484,115.00 in fees.  After a reduction of $307,404.50 for limited success, the Court awards $1,176,710.50 in attorneys' fees. The Court considers the resulting award to reflect the proper fee for the work performed in Marlo's ultimately successful action.

**IV.   COSTS**

The Court awards Marlo costs to be determined by the clerk. The Court declines to award UPS costs on the class certification and On Road Supervisor issues.

**V.    CONCLUSION**

For the foregoing reasons, the Court grants the Motion for Attorneys' Fees and sets the fee award at $1,176,710.50.  Pursuant to the Local Rules of this district, the applications for costs are before the Clerk.  See C.D. Cal. L.R. 54-3.

IT IS SO ORDERED.

Dated: August 12, 2009

DEAN D. PREGERSON
United States District Judge